STATE OF NORTH CAROLINA v. JAMES RUSSELL CORPENING

No. COA97-505

(Filed 17 March 1998)

**1. Jury § 50 (NCI4th)— jury array—racial composition—statistical disparity not sufficient**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to challenge the jury array based on alleged racial discrimination in the selection of the pool. Defendant's argument relies solely on a statistical disparity between the jury and the community; such a disparity, standing alone, is insufficient to prove that the underrepresentation is a product of systematic exclusion from the minority group.

**2. Jury § 260 (NCI4th)— lone black juror excused—*Batson* challenge—State's explanation**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendant's *Batson* challenge to the striking of the lone black juror where the State had offered as an explanation that the juror indicated previous contact with

STATE v. CORPENING

[129 N.C. App. 60 (1998)]

defendant and defendant's family, two of which were listed as potential witnesses for defendant and one of whom attended church with the juror's mother; the prospective juror seemed to lack an understanding of the questions; and a relative of the prospective juror had been a defendant in a murder case.

**3. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—statements by victim—admissible**

The trial court did not err in a first-degree murder prosecution by allowing into evidence statements made by the victim where the witnesses testified on *voir dire* that the victim had told them about marital difficulties, that defendant had threatened to kill her, and that she was afraid defendant would kill her. The logical inferences from the victim's statements and other evidence was that defendant killed the victim with premeditation and deliberation rather than as a result of a sudden heat of passion. The testimony was admissible to show the victim's state of mind, it was relevant to show the premeditated and deliberated nature of the murder, and the probative value was not substantially outweighed by any prejudicial effect.

**4. Evidence and Witnesses § 758 (NCI4th)— psychiatrist's testimony—defendant's remorse—testimony admitted after objection—no prejudice**

The trial court did not err in a first-degree murder prosecution by not admitting testimony from a psychiatrist about whether defendant had expressed remorse for his actions where the witness was subsequently allowed to testify that defendant was remorseful.

**5. Evidence and Witnesses §§ 1008, 1009 (NCI4th)— first-degree murder—conversation with victim—portions excluded**

The trial court did not abuse its discretion in a first-degree murder prosecution by excluding testimony from defendant's son about his conversation with his mother regarding her adulterous relationship with a co-worker where that portion of the testimony was not properly noticed and the witness was otherwise allowed to testify about the conversation, or by excluding her statements regarding the source of certain bruises on her body where the court had doubts about whether the testimony possessed sufficient guarantees of trustworthiness.

STATE v. CORPENING

[129 N.C. App. 60 (1998)]

Appeal by defendant from judgment entered 17 October 1996 by Judge Beverly T. Beal in Caldwell County Superior Court. Heard in the Court of Appeals 13 January 1998.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Thomas F. Moffitt, for the State.*

*Michael A. Grace, P.A., by Michael A. Grace, for defendant-appellant.*

WALKER, Judge.

Defendant was convicted of first-degree murder and sentenced to life imprisonment without parole. At trial, the State's evidence tended to show that in 1995 defendant was employed as a deputy with the Caldwell County Sheriff's Department (the sheriff's department). Sometime in June of 1995, defendant became aware that his wife (the victim) was seeing a co-worker, Robert Jackson (Jackson).

Defendant's uncle, Lieutenant David Bates (Bates) of the Sheriff's Department, testified that on 19 June 1995 he was in the parking lot of the sheriff's department when he saw defendant drive in and park his patrol car. Defendant started into the building, hesitated, and then turned around and walked over to where Bates was standing. At that time, defendant told Bates that earlier in the evening he had waited at Jackson's place of business and followed Jackson out of the parking lot. After stopping Jackson's car, defendant approached the vehicle and asked Jackson about his relationship with the victim. When Jackson laughed at defendant, defendant punched Jackson and hit him with a flashlight, bloodying Jackson's face. Bates immediately suspended defendant from duty and took his badge, weapon and the keys to his patrol car. On the following day, defendant resigned from the sheriff's department.

Bates further testified that the victim called him on 25 July 1995 and asked if he would take her to the Shelter Home of Caldwell County (the shelter), a battered women's shelter. Thereafter, Bates drove the victim to her house (the residence) to get some clothing and then took her to the shelter.

When she arrived at the shelter, the victim met Kathy Kennedy (Kennedy), who described the victim as "shaking and crying when she arrived." On the following morning, the victim spoke with Jane Haas (Haas), a court advocate for the shelter. With Haas' assistance, the victim obtained an *ex parte* domestic violence order against

defendant on 26 July 1995, with a hearing on the order scheduled for 4 August 1995. Thereafter, Haas and Bates went with the victim to the residence to obtain some clothing and other items, and then returned to the shelter.

On the morning of 4 August 1995, Haas and Kennedy accompanied the victim to the domestic violence hearing where defendant was present. After the hearing, the victim made arrangements with Bates to retrieve some additional belongings from the residence. After leaving the courthouse, the victim went with her sister-in-law, Terri Austin (Austin), to Austin's house where they waited before going to meet Bates. While the victim was at Austin's house, defendant called to talk to her. Austin answered the telephone and informed defendant that she and the victim were going to be coming by the residence soon to retrieve the victim's belongings.

At approximately 4:30 p.m. the victim arrived at the residence accompanied by Bates, Austin and her brother, Steve Austin. Upon their arrival, defendant was present and Bates informed him that the victim was not returning to stay but rather was there to obtain her belongings.

While the victim and her family went into her bedroom to get her belongings, Bates stayed with defendant in the living room. Thereafter, the victim walked into the kitchen and was followed by Bates and defendant. There, defendant demanded the victim return her house keys. As defendant approached her, the victim turned to face him when suddenly defendant grabbed her by the head, pulled her towards him and fired four fatal shots with a handgun. Bates, who was standing only a few feet away, drew his weapon before seeing a semi-automatic, 9 millimeter pistol drop from defendant's hand and hit the floor. Defendant was immediately arrested and taken into custody.

In his first two assignments of error, defendant contends that the trial court erred by (1) denying his motion to challenge the jury array in that the pool of potential jurors was selected in a racially discriminatory manner, and (2) allowing the State to strike the lone black juror from the pool in violation of the rule in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

[1] Defendant contends that his motion to challenge the jury array should have been allowed since blacks constituted approximately 5.5% of the Caldwell County population, while less than 2% of the jury pool was black.

N.C. Gen. Stat. § 9-2 (1986) outlines the statutory requirements for the selection of jurors and is designed to provide "a jury system completely free of discrimination to any cognizable group." *State v. Cornell*, 281 N.C. 20, 37, 187 S.E.2d 768, 778 (1972). Further, our Supreme Court has stated that:

> In order to establish a *prima facie* case that there has been a violation of the requirement that a jury be composed of persons who represent a fair cross-section of the community, defendant must document that the group alleged to have been excluded is a distinctive group; that the representation of the group in question within the venire is not fair and reasonable with respect to the number of such persons in the community; *and that this underrepresentation is due to systematic exclusion of the group in the jury selection process.*

*State v. Price*, 301 N.C. 437, 445, 272 S.E.2d 103, 109 (1980) (emphasis added).However, statistical evidence indicating a disparity between the number of minorities serving on a jury in relation to the number of minorities in the community, standing alone, is insufficient to prove that the underrepresentation is a product of systematic exclusion of the minority group. *State v. Harbison*, 293 N.C. 474, 481, 238 S.E.2d 449, 453 (1977).

Here, the trial court conducted a hearing at which the assistant clerk of Caldwell County Superior Court testified that the jury pool was randomly selected from voter registration and drivers' license lists pursuant to N.C. Gen. Stat. § 9-2. Further, she testified that fifty-three potential jurors reported for jury duty for the current term and that only one of those potential jurors was black. The trial court then made findings of fact consistent with this evidence, concluded that defendant had failed to show a systematic exclusion or underrepresentation of blacks in the jury pool, and denied defendant's motion. After a careful review, we conclude that since defendant's argument relies solely on a statistical disparity, the trial court did not err by denying defendant's motion and this assignment of error is overruled.

[2] As to defendant's *Batson* challenge, in *State v. Carter*, 338 N.C. 569, 451 S.E.2d 157 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995), our Supreme Court outlined a three-part test in determining whether a prosecutor has impermissibly excluded a juror on racial grounds: (1) "the defendant must establish a *prima facie* case that the prosecutor peremptorily challenged prospective jurors on

the basis of race;" (2) the prosecutor must then offer a "racially neutral explanation for each challenged strike;" and (3) the trial court must then determine whether the defendant has successfully proven "purposeful discrimination." *Id.* at 586, 451 S.E.2d at 166. Further, the trial court's findings should not be overturned absent a clear abuse of discretion. *Id.*

Here, after a hearing on the matter, the trial court determined that the defendant had established a *prima facie* showing of a discriminatory exercise of the peremptory challenge. Thereafter, the trial court found:

> The State offered as an explanation that in the voir dire examination of this juror he indicated previous contact with the defendant and the defendant's family, knowing Maxine Corpening and Chris Corpening, both of whom are listed as potential witnesses for the defense. That his mother attends church at the same church with Maxine Corpening. . . . That the prospective juror seemed to lack an understanding of the questions regarding knowledge of the persons on the list of jurors. [And] [t]hat the—a relative of the prospective juror had been a defendant in a murder case.

The trial court concluded "the State has shown race neutral reasons for the use of the peremptory challenge in this case. And the objection is overruled and the challenge is allowed to stand." *See State v. Crummy*, 107 N.C. App. 305, 420 S.E.2d 448, *disc. review denied and appeal dismissed*, 332 N.C. 669, 424 S.E.2d 411 (1992) (where our Court held that racially neutral grounds for excusing a juror include "the juror's knowledge of the defendant or a member of defendant's family. . . ." *Id.* at 322, 420 S.E.2d at 457).

After a careful review, we find the trial court did not abuse its discretion by ruling that the peremptory challenge by the State was not racially motivated in violation of *Batson* and we therefore overrule this assignment of error.

[3] Next, defendant contends the trial court erred by allowing into evidence statements made by the victim to certain witnesses. Our analysis of this issue involves a two-step process: (1) is the proffered testimony hearsay, and, if so, does it fall within a recognized exception to the hearsay rule; and, (2) is the proffered testimony relevant to a fact in issue in the case. Both of these parts must be met in order for the victim's statements to be introduced at trial. *York v. Northern*

*Hospital District*, 88 N.C. App. 183, 193, 362 S.E.2d 859, 866 (1987), *disc. review denied*, 322 N.C. 116, 367 S.E.2d 922 (1988).

At trial, the State offered the testimony of Bates, Kennedy, Haas, Austin and Robert Arney. A *voir dire* was conducted outside the presence of the jury, after which these witnesses were allowed to testify that the victim told them about marital difficulties, that defendant had threatened to kill her and that she was afraid defendant would kill her. Defendant contends these hearsay statements do not fall within the "state of mind" exception of Rule 803(3) and therefore should have been excluded.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is inadmissible unless it is subject to a recognized exception. N.C. Gen. Stat. § 8C-1, Rule 801 (1992); *see also* N.C. Gen. Stat. § 8C-1, Rule 802 (1992).

Rule 803(3) excepts from the hearsay rule:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C. Gen. Stat. § 8C-1, Rule 803(3) (1992).

The state of mind exception allows for the introduction of hearsay evidence which tends to "indicate the victim's mental condition by showing the victim's fears, feelings, impressions or experiences," so long as the possible prejudicial effect of such evidence does not outweigh its probative value under Rule 403. *State v. Walker*, 332 N.C. 520, 535, 422 S.E.2d 716, 725 (1992), *cert. denied*, 508 U.S. 919, 124 L. Ed. 2d 271 (1993); *see also State v. Holder*, 331 N.C. 462, 418 S.E.2d 197 (1992) (where the Court allowed hearsay statements to be admitted under the state of mind exception since they "tended to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder." *Id.* at 485, 418 S.E.2d at 210).

Nevertheless, even if evidence is admissible under a hearsay exception, it must still meet the relevancy requirement under Rule 402. N.C. Gen. Stat. § 8C-1, Rule 402 (1992); *see also York v. Northern*

*Hospital District*, 88 N.C. App. at 193, 362 S.E.2d at 866. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (1992). Further, "[a]n individual piece of evidence need not conclusively establish a fact to be of some probative value. It need only support a logical inference of the fact's existence." *State v. Payne*, 328 N.C. 377, 401, 402 S.E.2d 582, 596 (1991), *cert.* denied, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995); see *also State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991) (where the Court held that "[a]ny evidence offered to shed light upon the crime charged should be admitted by the trial court." *Id.* at 314, 406 S.E.2d at 897) (citation omitted).

In a prosecution for first-degree murder, the State must show that the defendant unlawfully killed another human being with malice, premeditation and deliberation. *State v. Crawford*, 344 N.C. 65, 74, 472 S.E.2d 920, 926 (1996). Premeditation means "that defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing . . .," and deliberation means "that defendant carried out the intent to kill in a cool state of blood, 'not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.'" *Id.* (citation omitted). Furthermore, since premeditation and deliberation relate to a defendant's mental processes, they are ordinarily not susceptible to proof by direct evidence and must be proven by circumstantial evidence. *State v. Walker*, 332 N.C. at 532, 422 S.E.2d at 723.

Circumstances which give rise to an inference of premeditation and deliberation are (1) "conduct and statements of the defendant before and after the killing," (2) "threats made against the victim by the defendant, ill will or previous difficulty between the parties," and (3) "evidence that the killing was done in a brutal manner." *State v. Bullard*, 312 N.C. 129, 161, 322 S.E.2d 370, 388 (1984); *see also State v. Walker*, 332 N.C. at 533, 422 S.E.2d at 724.

Here, the testimony of the victim's statements tend to show the existence of ill will between the parties because of marital difficulties, and the fact that defendant had threatened the victim on several occasions, causing the victim to fear for her life. Other evidence tended to show that on the day of the murder defendant knew the victim was coming to the residence to gather her belongings; while there, defendant followed the victim into the kitchen; defendant had a loaded weapon on or about his person while in the kitchen; and

defendant fired four shots into the victim at close range. We conclude that logical inferences from all of this evidence shows that defendant killed the victim with premeditation and deliberation rather than as a result of a sudden heat of passion.

Therefore, the proffered hearsay testimony was admissible under Rule 803(3) to show the victim's then-existing state of mind, and was relevant, together with all the other evidence, under Rule 402 to show the premeditated and deliberated nature of the murder. Further, the probative value of this evidence is not substantially outweighed by any prejudicial effect under Rule 403. *See* N.C. Gen. Stat. § 8C-1, Rule 403 (1992). As such, the trial court did not err by admitting this evidence.

**[4]** Defendant next contends the trial court erred by failing to admit certain testimony from a clinical psychologist, Dr. Claudia Coleman (Dr. Coleman), and defendant's son, Chris Corpening.

Dr. Coleman was called by defendant to testify as to whether defendant had expressed remorse for his actions on 4 August 1995. During defendant's examination of Dr. Coleman, she was asked whether "an individual who's suffering from severe major depression and in this period of recovery be less remorseful of his actions?" The trial court sustained the State's objection, but thereafter Dr. Coleman was permitted to describe in detail defendant's "general demeanor" during their conversations. Dr. Coleman observed that defendant was "tearful, he was anxious, he was depressed with regard to the death of his wife and his behavior at that time." Further, Dr. Coleman stated that defendant was "very remorseful and felt very, very guilty and acted that way, looked that way."

In reviewing the above testimony of Dr. Coleman, it is apparent that, after the initial objection by the State, Dr. Coleman was allowed to testify that defendant expressed remorse for his actions. Therefore, the following rule in this State applies:

> [T]he exclusion of testimony cannot be held prejudicial when the same witness is thereafter allowed to testify to the same import, or when the evidence is thereafter admitted, or when the party offering the evidence has the full benefit of the fact sought to be established thereby by other evidence.

*State v. Ransome*, 342 N.C. 847, 853, 467 S.E.2d 404, 408 (1996). As such, this assignment of error is overruled.

[5] After defendant called Chris Corpening, the trial court conducted a *voir dire* to determine whether the victim's statements regarding her relationship with Jackson, as well as her statements regarding the source of certain bruises on her body, were admissible.

Following the hearing, the trial court allowed Chris Corpening to testify about his conversation with his mother regarding her relationship with Jackson, except for that portion concerning an alleged "adulterous" relationship which was not properly noticed. The trial court also expressed doubt as to whether Chris Corpening's testimony, about the victim having told him that her bruises were the result of an altercation with Jackson's wife, possessed sufficient guarantees of trustworthiness. After a careful review, we conclude the trial court did not abuse its discretion in excluding this evidence, and we therefore overrule this assignment of error.

We have examined defendant's remaining assignments of error and find them to be without merit. The defendant received a trial free of prejudicial error.

No error.

Judges EAGLES and WYNN concur.