STATE OF NORTH CAROLINA v. BENJAMIN ALDRIDGE

No. COA99-957

(Filed 29 August 2000)

**1. Jury— allegations of juror misconduct—anonymous telephone call**

The trial court did not abuse its discretion in a first-degree murder case by refusing to conduct an inquiry into an alleged incident of possible juror misconduct based solely on an anonymous telephone call, because an examination of the juror involved in alleged misconduct is not always required, especially where the allegation is nebulous or where the witness did not overhear the juror or third party talk about the case.

**2. Appeal and Error— preservation of issues—failure to obtain a ruling**

The trial court did not abuse its discretion in a first-degree murder case by refusing to conduct an inquiry into an alleged incident of possible juror misconduct based on a juror informing the clerk during trial that he recognized two potential witnesses in the audience, because defendant failed to obtain a ruling on the request for an inquiry as required by N.C. R. App. P. 10(b)(1), and therefore, did not preserve this question for appellate review.

STATE v. ALDRIDGE

[139 N.C. App. 706 (2000)]

**3. Evidence— hearsay—state of mind exception**

The trial court did not err in a first-degree murder case by admitting statements which the victim made to another person six months prior to the murder about the victim's deteriorating relationship with defendant and her intent to end their marriage, because the state of mind exception under N.C.G.S. § 8C-1, Rule 803(3) allows for the introduction of hearsay evidence which tends to indicate the victim's mental condition by showing the victim's fears, feelings, impressions, or experiences at the time the statements were made, so long as the possible prejudicial effect does not outweigh its probative value under N.C.G.S. § 8C-1, Rule 403.

**4. Evidence— opinion testimony—victim's state of mind**

The trial court did not err in a first-degree murder case by admitting the testimony of two witnesses concerning the victim's mental state on the day before her death because opinion testimony, including lay opinion testimony, is admissible concerning the state of a person's appearance or emotions on a given occasion.

**5. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence**

The trial court did not err in a first-degree murder case by denying defendant's motions to dismiss at the close of the State's evidence and at the close of all evidence, because there was sufficient evidence to show that defendant husband was the killer, including evidence that: (1) the victim was stabbed eleven times with knives from the kitchen of the residence; (2) there were no signs of forced entry; (3) money and other valuables were found on the kitchen table; (4) there was evidence that the victim wanted defendant to leave the residence and that she no longer wanted to be married; and (5) defendant on numerous occasions inquired as to the particulars of how an inmate murdered his girlfriend.

**6. Evidence— prior crimes or acts—propensity to commit crime**

Although the trial court erred in a first-degree murder case by admitting testimony of defendant's two former wives concerning his behavior towards them during their marriages based on the fact the evidence was only relevant to show defendant's propensity to commit the crime in this case, in violation of N.C.G.S.

§ 8C-1, Rule 404(b), the error was not prejudicial because a different result would not have been reached had the error not occurred. (Concurring in result opinion by Judge Smith with which Judge Timmons-Goodson joined.)

Judge SMITH concurring in result.

Judge TIMMONS-GOODSON joins in the concurring opinion.

Appeal by defendant from judgment entered 17 December 1998 by Judge Zoro J. Guice, Jr. in McDowell County Superior Court. Heard in the Court of Appeals 18 May 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Robert C. Montgomery, for the State.*

*C. Frank Goldsmith, Jr. for defendant-appellant.*

WALKER, Judge.

Defendant was convicted of first degree murder and sentenced to life imprisonment without parole. The State's evidence tended to show that on 17 May 1997 at about 4:34 a.m., sheriff's deputies responded to a burglary report at the victim's and defendant's residence. When the deputies arrived at the residence, defendant stated that someone had broken into his home and stabbed his wife, Gwendolyn Aldridge (victim).

Deputy Roscoe Bailey testified that upon arrival at the residence at about 4:47 a.m. on 17 May 1997, defendant was standing outside and told Deputy Bailey that he needed help because someone had broken into his house and stabbed the victim. Defendant pointed to a basement door that appeared closed and undisturbed. Deputy Bailey followed defendant into the residence where he saw two knives at the foot of the steps and found the nude body of the victim lying face up in an upstairs bedroom. She had stab wounds and the area around her body was very bloody. Deputy Bailey also testified that when he arrived, he did not notice any activity in the area surrounding the residence.

Deputy Gerald Hicks testified that when he arrived at the residence, he noticed the defendant was wearing brown shorts, no shirt or shoes, and had blood on his chest, hands, arms and legs. Further, Deputy Hicks testified that defendant led him to the bedroom where the victim was lying, and the defendant pointed to the two knives at

**STATE v. ALDRIDGE**

[139 N.C. App. 706 (2000)]

the foot of the steps. Deputy Hicks was present when Detective Thomas Farmer interviewed the defendant, who repeatedly stated that he knew the sheriff and needed to speak with him.

Deputy Kevin Fineberg testified that when he and Deputy Randy Smith arrived, they did a security check of the residence and found an exterior wooden door in the basement that was slightly open. However, the screen door on the outside of this wooden door appeared to be locked. Additionally, he did not observe any footprints in the grass area close to this door, although there was a heavy dew on the ground. Finally, Deputies Fineberg and Smith testified that they did not observe any signs of forced entry.

Detective Farmer testified that when he observed the victim's body, there appeared to be hand prints on each of the victim's ankles. Detective Farmer also testified the defendant told him that around 8:30 p.m. on 16 May 1997, the defendant and victim were watching television and the defendant decided to go to bed. Defendant told the victim good night, left her in the bedroom watching television, and went to his bedroom and shut the door. Defendant stated that he and the victim slept in separate bedrooms since each snored heavily. Later, the telephone rang and the victim told him his daughter was calling to speak to him. Defendant spoke to his daughter and then returned to his bedroom and went to sleep. Around 4:00 a.m., the defendant awoke when he heard his wife screaming. The defendant thought he heard footsteps running down the hallway away from the victim's bedroom. The defendant followed the sounds of the footsteps to the kitchen area. He checked the back door and found it to be shut and locked. Defendant then went to the victim's bedroom where he found the victim had been stabbed and was slumped over the bed. He ran behind her, pulled her back, and laid her on the floor. Defendant then called 911. Defendant stated that the two knives at the foot of the steps were from the kitchen of the residence. Defendant stated that he and the victim always locked the doors to the residence at night, that all the doors were locked when he went to bed, and that he and the victim had never experienced problems with prowlers or suspicious people.

Agent Andrew Cline of the North Carolina State Bureau of Investigation (SBI) testified he was a crime scene specialist, that he examined the residence, and that he found no signs of forced entry. In the kitchen, he noticed a knife block was missing two knives. The two knives located at the foot of the steps matched the kitchen set of knives. He found an unzipped purse containing an empty wallet and a

STATE v. ALDRIDGE

[139 N.C. App. 706 (2000)]

bank envelope containing $200 cash on the dining room table. A set of keys was underneath the purse and a ladies' watch was also on the table.

SBI Agent Bruce Jarvis testified that on the morning of 17 May 1997, he interviewed the defendant, who stated defendant repeated the events of 16 May 1997 to Agent Jarvis. The defendant and the victim had been married almost ten years. The defendant had been married twice previously. Defendant admitted he struck his first wife Carolyn Aldridge on one occasion when they were married. Defendant stated that he and his second wife, Elaine Coffey, fought and argued all the time, but he did not know if he ever hit her. Defendant denied ever assaulting his previous wives with a weapon. Defendant works for the Department of Corrections and supervises inmates who are housed at the Burke County Jail.

Dr. Donald Jason performed the autopsy of the victim and testified that he observed eleven stab wounds on the victim, including two stab wounds to the vaginal area which were the last ones inflicted. Additionally, there were no wounds on the victim which would indicate she was attempting to defend herself.

David Spittle, a crime lab specialist with the SBI, testified that the two knives revealed the presence of blood, but that there was an insufficient amount to conduct any DNA analysis. Joyce Petzka, a fingerprint analyst with the SBI, testified there was insufficient fingerprint evidence on the knives to conduct a comparison with the defendant's fingerprints.

Geoffrey Austin, the victim's son, testified that his mother was usually very talkative but when he spoke to her on the telephone on 16 May 1997, she "seemed very quiet" and "somewhat withdrawn."

Barbara Powell, a co-worker and friend of the victim, testified that on 16 May 1997, the victim "seemed really pre-occupied, quiet, unusually quiet."

Josephine Reep, a co-worker and friend of the victim, testified to statements the victim made to her concerning the victim's marriage to the defendant. Ms. Reep testified that she and the victim had a conversation in November or December 1996, during which the victim stated that the defendant told her that because of the bad neighborhood in which they lived, one day he might come home to find her dead with her throat cut and her body sliced up with a knife. The victim stated that the defendant wanted her to sell her home "so he can

get a hold of some of my money." Additionally, the victim told Ms. Reep that she no longer wanted to be married and that she wanted the defendant to leave the residence and that if the defendant had not left by May 1997, she planned to "push the issue."

Robert Hurt, a co-worker of the defendant, testified that he overheard the defendant speaking to an inmate. The inmate was convicted of murdering his own girlfriend. Mr. Hurt testified that the defendant, on approximately twelve occasions, asked the inmate questions regarding how, when, and where the inmate committed his crime, and how and when it was reported to the authorities.

Defendant's first wife, Carolyn Aldridge, testified that she was married to the defendant for approximately eleven years and that near the end of their marriage she was "smacked" four or five times by the defendant. Additionally, when she left the defendant in 1981, an argument between them turned violent and as she drove away with their two daughters, the defendant fired two shots from a pistol.

Defendant's second wife, Elaine Coffey, testified they were married in 1983, and after about a week of marriage, the defendant "got really physically abusive. He would beat me, stomp me, choke me." Ms. Coffey left the defendant, but the two reconciled. After about two years of marriage, when she asked the defendant to leave the home she owned, he threw rocks at her and her children and threatened to "blow [her] brains out" and pointed a pistol at her. Ms. Coffey obtained a domestic violence order to keep the defendant away from her and they were later divorced. Defendant did not offer any evidence.

[1] Defendant first argues the trial court erred in refusing to conduct an inquiry into two incidents of possible juror misconduct.

On Monday of the second week of the trial, defense counsel reported to the trial court that upon his return to his office the previous Friday afternoon after court, he received the following message from his secretary:

Thought you would like to know. This—a lady called. I asked for her name and she said the first name was Tina. She was reluctant at giving it, so it may not be her first name. She said Grace Ann Proffitt [Juror #2], one of your jurors, has been talking about the case with her mother-in-law, Geraldine Proffitt. Tina works at the same company that Geraldine does and overheard Geraldine

talking to other ladies on the lunch break. She said that Geraldine said that [Juror #2] told her the day she came back from being picked as a juror that she thought [the defendant] was guilty just by the look on his face.

Defendant requested an inquiry into the possible misconduct of Juror #2, and the trial court took the matter under advisement. Prior to the trial court giving the jury instructions, defendant again requested the trial court make an inquiry into Juror #2's possible misconduct. After hearing arguments from both the State and the defendant, the trial court made extensive findings and concluded in part that:

No credible, reliable, substantive or believable evidence has been presented to this court in order to justify the court bringing Juror #2 into open court and conducting an inquiry with respect to Juror #2. That to do so would serve no useful purpose but to embarrass Juror #2 and result in the necessity of the court then having to remove the said juror from this jury panel with prejudice most definitely resulting to the State and the defendant by such an inquiry and by such embarrassment.

That such information is rank hearsay, which the Defendant has presented to this Court with respect to the said motion, cannot serve as any basis for any inquiry with respect to the said juror.

. . .

There is absolutely no credible, reliable evidence for the court to even make an assumption that Juror # 2, Grace Proffitt, has not complied with or followed the court's instructions which the court gave to her and told her that applied to all recess periods and instructed her to follow.

Whether alleged misconduct has affected the impartiality of a particular juror is a discretionary determination for the trial court. *See State v. Rutherford,* 70 N.C. App. 674, 677, 320 S.E.2d 916, 919 (1984), *disc. review denied,* 313 N.C. 335, 327 S.E.2d 897 (1985). Misconduct must be determined by the facts and circumstances of each case. *Id.* The trial court has the responsibility to make such investigations as may be appropriate, including examination of jurors when warranted, to determine whether misconduct has occurred and, if so, whether such conduct has resulted in prejudice to the defendant. *See State v. Williams,* 330 N.C. 579, 583, 411 S.E.2d 814, 817

(1992). "The circumstances must be such as not merely to put suspicion on the verdict, because there was opportunity and a chance for misconduct, but that there was in fact misconduct. When there is merely matter of suspicion, it is purely a matter in the discretion of the presiding judge." *State v. Johnson*, 295 N.C. 227, 234-35, 244 S.E.2d 391, 396 (1978) (*quoting Lewis v. Fountain*, 168 N.C. 277, 279, 84 S.E. 278, 279 (1915)). The trial court's ruling on the question of juror misconduct will not be disturbed on appeal unless it is clearly an abuse of discretion. *See State v. Sneeden*, 274 N.C. 498, 504, 164 S.E.2d 190, 195 (1968). A denial of motions made because of alleged juror misconduct is equivalent to a finding that no prejudicial misconduct has been shown. *See State v. Jackson*, 77 N.C. App. 491, 502-03, 335 S.E.2d 903, 910 (1985). An examination of the juror involved in alleged misconduct is not always required, especially where the allegation is nebulous or where the witness did not overhear the juror or third party talk about the case. *See Jackson*, 77 N.C. App. at 503, 335 S.E.2d at 910-11.

Thus, based solely on an anonymous telephone call, the trial court did not abuse its discretion in failing to inquire further as to whether Juror #2 may have violated its instructions.

**[2]** Defendant's assignment of error also relates to the trial court's refusal to conduct an inquiry of a juror "who informed the clerk during the trial that he recognized two potential witnesses in the audience." When the defendant requested this inquiry, the trial court also took the matter under advisement. Defendant did not later obtain a ruling on the matter.

Pursuant to Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure, the complaining party must "obtain a ruling upon the party's request, objection or motion" in order to preserve a question for appellate review. Defendant failed to obtain a ruling on the request and thus did not preserve the question for appellate review.

Next, defendant argues the trial court erred in admitting testimony of defendant's two former wives concerning his behavior towards them during their marriages. Defendant contends the evidence was too remote in time and did not bear any similar circumstances to the alleged offense.

Character evidence may be admissible for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, iden-

tity, or absence of mistake, entrapment or accident. *See* N.C. Gen. Stat. § 8C-1, Rule 404(b) (1999). The list of permissible purposes is not exclusive and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime. *See State v. Hipps*, 348 N.C. 377, 404, 501 S.E.2d 625, 641 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999). Even if admissible under Rule 404(b), the probative value of evidence must still outweigh the danger of undue prejudice to the defendant to be admissible under Rule 403. *See State v. Everhardt*, 96 N.C. App. 1, 18, 384 S.E.2d 562, 572 (1989), *affirmed*, 326 N.C. 777, 392 S.E.2d 391 (1990). The test of admissibility examines whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of Rule 403. *See State v. Wilson*, 106 N.C. App. 342, 348, 416 S.E.2d 603, 607 (1992); *State v. Frazier*, 344 N.C. 611, 615, 476 S.E.2d 297, 299 (1996). Remoteness for purposes of 404(b) must be considered in light of the specific facts of each case and the purposes for which the evidence is being offered. *See Hipps*, 348 N.C. at 405, 501 S.E.2d at 642. Remoteness is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident. *Id.* It is not necessary that the similarities between the two situations rise to the level of the unique and bizarre. *See State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991). Rather, the similarities simply must tend to support a reasonable inference that the same person committed both the earlier and later acts. *Id.* Evidence of prior behavior following a rejection in a romantic relationship is admissible to prove motive and identity. *See State v. Parker*, 113 N.C. App. 216, 224, 438 S.E.2d 745, 750-51 (1994).

The determination to exclude evidence on these grounds is left to the sound discretion of the trial court. *See State v. Anderson*, 350 N.C. 152, 175, 513 S.E.2d 296, 310, *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986); *State v. Mickey*, 347 N.C. 508, 518, 495 S.E.2d 669, 676, *cert. denied*, 525 U.S. 853, 142 L. Ed. 2d 106 (1998) (citation omitted).

The trial court, after *voir dire* examinations of Carolyn Aldridge and Elaine Coffey, entered extensive findings and made the following conclusions in part:

That the said evidence is relevant and probative with respect to situations that develop at the time of a break-up of a marriage between the Defendant . . . and a wife. That the said evidence indicates and reveals that at the time of the break-up of every marriage that the Defendant . . . has acted violently and in this case criminally and in the other two cases criminally upon receiving information from his spouse as to the said break-up.

That the evidence in question in this case reveals and indicates the identity of the perpetrator of the said acts inflicted upon the body of the decedent . . . .

. . .

[T]hat remoteness in time does not under the law of North Carolina exclude evidence or make the said evidence excludable. That any remoteness or space of time deals with the weight of the evidence sought to be admitted and that the question of the weight of any evidence is a question to be determined by the jury and not by the Court . . . .

. . .

That the Supreme Court of North Carolina in *State v. Hipps* noted, "remoteness in time is less significant where the prior crime used is to show intent, motive, knowledge or lack of accident." That all of these facts are present in the case now before this Court . . . .

. . .

That the evidence in question indicates similar circumstances as a result of the separation by the Defendant from two prior wives which have a direct connection and relevance to the present state of affairs at the time of the occasion in question in this case . . . .

The evidence from defendant's two former wives tended to show that as the marriages deteriorated, defendant responded violently. There was evidence that the victim planned to separate from the defendant about the time of the murder. The trial court properly concluded the testimonies of Carolyn Aldridge and Elaine Coffey were relevant in establishing the identity of the perpetrator of the murder. Defendant has failed to show the trial court abused its discretion in admitting this evidence, and this assignment of error is overruled.

**[3]** Next, defendant argues the trial court erred in admitting statements which the victim made to Josephine Reep. Defendant contends this evidence should have been excluded pursuant to Rules 804(b)(5), 803(3) and 403 of the North Carolina Rules of Evidence.

The State filed a notice of intent to use the victim's statements on 16 November 1998. On 7 December 1998, the defendant filed a *motion in limine* to exclude any evidence of alleged hearsay statements made by the victim. The trial court deferred ruling on the motion until trial. After a *voir dire* examination of Ms. Reep, the trial court entered findings and conclusions and denied defendant's motion.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is inadmissible unless it is subject to a recognized exception. N.C. Gen. Stat. § 8C-1, Rule 801 (1999); *see also* N.C. Gen. Stat. § 8C-1, Rule 802 (1999). Rule 803(3) excepts from the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C. Gen. Stat. § 8C-1, Rule 803(3) (1999).

The state of mind exception allows for the introduction of hearsay evidence which tends to "indicate the victim's mental condition by showing the victim's fears, feelings, impressions or experiences," so long as the possible prejudicial effect of such evidence does not outweigh its probative value under Rule 403. *State v. Corpening*, 129 N.C. App. 60, 66, 497 S.E.2d 303, 308, *disc. review denied*, 348 N.C. 503, 510 S.E.2d 659 (1998) (*quoting State v. Walker*, 332 N.C. 520, 535, 422 S.E.2d 716, 725 (1992), *cert. denied*, 508 U.S. 919, 124 L. Ed. 2d 271 (1993)). Rule 803(3) does not refer to the victim's state of mind at the time of death, but refers to the victim's state of mind at the time the statements were made. *See State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 302 (1993), *cert. denied*, 511 U.S. 1046, 128 L. Ed. 2d 220 (1994).

In *McHone*, our Supreme Court held that hearsay testimony was admissible under Rule 803(3) where witnesses testified to the victim's statements, made at least six months prior to the murder, regarding

her fear of the defendant. The hearsay statements recited threats made to the victim by the defendant and the victim's fear that defendant would kill her. Defendant argued that the prejudicial effect outweighed the probative value since the statements were made six months prior to the murder. The *McHone* court disagreed and held, "the evidence tended to show a stormy relationship over a period of years leading up to the murders in this case, and the fact that the last incident testified to occurred six months prior to the murders does not deprive the evidence of its probative value." *McHone*, 334 N.C. at 637-38, 435 S.E.2d at 302.

Here, Ms. Reep testified to statements made by the victim approximately six months prior to the murder, which consisted of the following: she and the defendant were not getting along well; she no longer wanted to be married; if the defendant had not left by May 1997, she would "push the issue" for him to leave; and the defendant told her that one day he would come home and find her dead with her throat cut and her body sliced up with a knife; and the victim believed the defendant wanted her to sell her house so he could get some of her money. Under these circumstances, the trial court did not err in admitting the statements of the victim. *See State v. Murillo*, 349 N.C. 573, 587, 509 S.E.2d 752, 759 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999) (holding that victim's hearsay statements indicating that she intended to end the marriage reflected her state of mind and were admissible under Rule 803(3)); *see also State v. Holder*, 331 N.C. 462, 485, 418 S.E.2d 197, 210 (1992) (where the Court upheld admitted hearsay statements under the state of mind exception since they "tended to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder").

[4] Next, defendant contends the trial court erred in admitting testimony concerning the victim's mental state on the day before her death. Defendant contends the testimonies of Geoff Austin and Barbara Powell, about the victim's emotional state, were "beyond the bounds of competent testimony."

Opinion testimony, including lay opinion testimony, is admissible concerning the state of a person's appearance or emotions on a given occasion. *See State v. Burke*, 343 N.C. 129, 153, 469 S.E.2d 901, 913, *cert. denied*, 519 U.S. 1013, 136 L. Ed. 2d 409 (1996) (holding that witness testimony that victim was "tense" and "scared of something" was admissible since it tended to show victim's state of mind at the time).

Austin, the victim's son, testified that his mother "seemed very quiet" and "somewhat withdrawn" when he spoke to her on the telephone the night before her death. Powell, the victim's friend and co-worker, testified that the victim seemed "pre-occupied" and "unusually quiet" on the day before her death. Both witnesses' testimonies tended to show the victim's state of mind and therefore defendant's argument is without merit.

[5] Next, defendant argues the trial court erred in denying defendant's motion to dismiss at the close of the State's evidence and again at the close of all evidence.

On a defendant's motion to dismiss for insufficiency of the evidence, the trial court must consider "whether there is substantial evidence of each essential element of the offense charged, or of a lesser included offense of that charged." *State v. Robbins*, 309 N.C. 771, 774, 309 S.E.2d 188, 190 (1983). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Scott*, 323 N.C. 350, 353, 372 S.E.2d 572, 575 (1988). The evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference. *State v. Wright*, 127 N.C. App. 592, 596-97, 492 S.E.2d 365, 368 (1997), *disc. review denied*, 347 N.C. 584, 502 S.E.2d 616 (1998). Further, if the trial court determines that a reasonable inference of the defendant's guilt may be drawn from the evidence, it must deny the defendant's motion even though the evidence may also support reasonable inferences of the defendant's innocence. *Id.* at 597, 492 S.E.2d at 368.

The State's evidence showed that the victim was stabbed eleven times with knives from the kitchen of the residence. There were no signs of forced entry, notwithstanding defendant's statement to the contrary about hearing footsteps in the residence. Money and other valuables were found on the kitchen table. There was evidence that the victim wanted the defendant to leave the residence and that she no longer wanted to be married. Additionally, the defendant on numerous occasions inquired as to the particulars of how an inmate murdered his girlfriend. Although the State's case centered around circumstantial evidence, a careful review of the record reveals that this evidence points to the defendant as the killer. Therefore, the evidence taken in the light most favorable to the State was sufficient to withstand defendant's motions to dismiss.

We have carefully reviewed defendant's remaining assignments of error and find them to be without merit.

In sum, defendant received a fair trial free from prejudicial error.

No error.

Judge SMITH concurs in the result with a separate opinion.

Judge TIMMONS-GOODSON joins in Judge SMITH'S concurring in the result opinion.

Judge SMITH concurring in result.

[6] I disagree with that portion of the majority opinion addressing N.C.G.S. § 8C-1, Rule 404(b) (1999) (Rule 404(b)). In relevant part, Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

As noted by the majority, "such evidence is admissible as long as it is relevant to any fact or issue *other than the defendant's propensity to commit the crime.*" (emphasis added). I believe the evidence at issue herein elicited from defendant's ex-wives is relevant only to defendant's propensity to commit the crime, and I therefore disagree with that portion of the majority opinion which holds such evidence is admissible.

The trial court's findings stated that the evidence offered by defendant's ex-wives "indicates and reveals that at the time of the break-up of every marriage that the [d]efendant . . . has acted violently . . . upon receiving information from his spouse as to the said break-up." Defendant's first wife, Carolyn Aldridge, testified that near the end of their marriage in 1981 defendant "smacked" her four or five times and fired two shots from a pistol in her direction. Defendant's second wife, Elaine Coffey, testified that approximately two years after their 1983 marriage, defendant threw rocks at her and pointed a pistol at her when asked to leave her home.

The victim in this case, defendant's third wife, was stabbed eleven times on 17 May 1997. Simply put, the incidents involving defendant's ex-wives are not "sufficiently similar" to the murder in question as to

be relevant to any factor other than defendant's propensity towards violence. *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991) (test of admissibility is whether prior incidents are "sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in" N.C.G.S. § 8C-1, Rule 403 (1999)). Further, the incidents occurred over twelve years before the commission of the murder at issue, thus bringing into question whether the prejudicial effect of the ex-wives' testimony outweighs its probative value. *See id.*

Walker, J. cites *State v. Parker*, 113 N.C. App. 216, 224, 438 S.E.2d 745, 750-51 (1994) for the proposition that "[e]vidence of prior behavior following a rejection in a romantic relationship is admissible to prove motive and identity." However, in that case, Ms. Thomas, the witness offering the evidence in question, and Ms. Welborn, the murder victim,

> had rejected defendant in a relationship, [after which] defendant kept both women under constant surveillance; threatened to kill both women; threatened to commit suicide over both women; ran both women off the road with his vehicle; pulled weapons on both women; . . . stabbed Ms. Thomas,

*id.* at 225, 438 S.E.2d at 751; and shot and killed Ms. Welborn. The incident with Ms. Thomas took place five years before Ms. Welborn was murdered. *Id.* In the instant case, the incidents involving defendant's ex-wives and the victim took place over twelve years apart, and there are no similarities between the incidents other than defendant's general violent tendencies on learning of a break-up. Though the majority attempts to use the ex-wives' testimony to show identity, I believe the similarities are completely insufficient for this purpose.

Notwithstanding, I do not believe the trial court's error was so prejudicial to defendant that a different result would have been reached had the error not occurred. *See* N.C.G.S. § 15A-1443(a) (1999) (in order for error to be prejudicial, there must be a "reasonable possibility that, had the error in question not been committed, a different result would have been reached"); *see also State v. Jolly*, 332 N.C. 351, 363, 420 S.E.2d 661, 668 (1992) (though improper to admit evidence under Rule 404, error was not prejudicial to defendant). I therefore concur in the result.

Judge TIMMONS-GOODSON joins in the concurring opinion.